David P. Lennon, OSB # 125575
Lennon & Klein, P.C.
3922 Bellinger Lane
Medford, OR 97501
Telephone:      212-465-2020
Facsimile:      212-202-5337
E-mail:          david@lennon-klein.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| ORBITAL PUBLISHING GROUP, INC., a New York corporation, and LIBERTY PUBLISHERS SERVICE, INC., a New York corporation**,** | Case No. 1:15-cv-00480-CL |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| -against- | **(ORAL ARGUMENT REQUESTED)** |
| BRIDGET WELLS, individually, and PERIODICAL WATCHGUARD, LLC., a North Carolina limited liability company, | |
| Defendants. | |

Of Counsel:

David P. Lennon

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE ALLEGATIONS OF THE COMPLAINT AND THE BACKGROUND . . . . . . . . . . . . . 3

    Defendants' Improper Conduct Within the Publishing Industry . . . . . . . . . . . . . . . . . . 5

    Wells' Improper Conduct with Attorney Generals' Offices . . . . . . . . . . . . . . . . . . . . . 9

    Wells' Improper Conduct With Banks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    POINT I

        THIS COURT HAS PERSONAL JURISDICTION OVER WELLS AND
        PERIODICAL WATCHGUARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.    Purposeful Availment or Direction Generally . . . . . . . . . . . . . . . . . . . . . 15

        B.    Defendants' Conduct With Oregon Gives Rise to Plaintiffs' Claims . . 19

        C.    It Is More Than Reasonable for the Court to Find Jurisdiction Over
             Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    POINT II

        VENUE IS PROPER IN OREGON . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    POINT III

        OREGON'S ANTI-SLAPP STATUTE DOES NOT APPLY, AND EVEN IF IT
        DOES APPLY, PLAINTIFFS DEMONSTRATED A PROBABILITY THAT
        THEY WILL PREVAIL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        A.    Oregon's Anti-SLAPP Statute Should Not Even Apply in
             Federal Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        B.    If the Court Determines That Oregon's Anti-SLAPP Statute Even Applies
             in Federal Court, the Anti-SLAPP Statute Does Not Apply in this Case as
             There Is No Protected Speech at Issue . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        C.    Assuming Defendants Carry Their Burden to Show That Their Conduct
             and Statements Are Covered by O.R.S. § 31.150(3), Plaintiffs Have
             Demonstrated A Prima Facie Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    POINT IV

        PLAINTIFFS HAVE STATED A CLAIM FOR
        INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

*Allen v. Hall,* 328 Or. 276, 974 P.2d 199 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Arista Records, LLC v. Doe 3,* 604 F.3d 110 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Ballard v. Savage,* 65 F.3d 1495 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Bates v. Bankers Life and Casualty Company,* 993 F. Supp.2d 1318 (D. Or. 2014) . . . . . . . . 14

*Burger King Corporation v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174,
   85 L.Ed.2d 528 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 16, 20

*Daniels-Hall v. National Educational Association,* 629 F.3d 992 (9th Cir. 2010) . . . . . . . . . 28

*Data Discount Incorporated v. Systems Technology Assocs.,*
   *Incorporated,* 557 F.2d 1280 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

*Decker Coal Company v. Commw. Edison Company,* 805 F.2d 834 (9th Cir. 1986) . . . . . . . . 13

*Doe v. Unocal Corporation,* 248 F.3d 915 (9th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Employers' Fire Insurance Company v. Love It Ice Cream Company,*
   670 P.2d 160, 64 Or.App. 784 (Or. App., 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Erie Railroad Company v. Tompkins,* 304 U.S. 64 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Federal Deposit Insurance Corporation v. British - American Insurance*
   *Company., LTD,* 828 F.2d 1439 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Foman v. Davis,* 371 U.S. 178 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Gray and Company v. Firstenberg Machinery Company,* 913 F.2d 758 . . . . . . . . . . . . . . . . . . 12

*Hanna v. Plumer,* 380 U.S. 460 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d
   404(1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*International Shoe Company v. State of Wash.,* 326 U.S. 310 (1945) . . . . . . . . . . . . . . . . . . . . 13

*Keeton v. Hustler Magazine, Incorporated,* 465 U.S. 770,
      104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 21

*Makaeff v. Trump University, LLC,* 715 F.3d 254 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . 23

*Mattel, Incorporated v. MCA Records, Incorporated,* 296 F.3d 894 (9th Cir.2002) . . . . . . . . 16

*McGanty v. Staudenraus,* 321 Or. 532, 901 P.2d 841 (1995)  . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Metabolic Research, Incorporated v. Ferrell,* 693 F.3d 795 (9th Cir. 2012) . . . . . . . . . . . . . . 23

*Metabolife International, Incorporated v. Wornick,* 264 F.3d 832 (9th Cir. 2001) . . . . . . . . . 24

*Newcal Indus. v. Ikon Office Solution,* 513 F.3d 1038 (9th Cir. 2008)  . . . . . . . . . . . . . . . . . . 28

*Plant Food Co-Op v. Wolfkill Feed and Fertilizer Corporation,* 633 F.2d 155 (9th Cir.1980)   16

*Royalty Network, Incorporated v. Harris,* 756 F.3d 1351 (11th Cir. 2014) . . . . . . . . . . . . . . . 25

*Schwarzenegger v. Fred Martin Motor Company,* 374 F.3d 797 (9th Cir., 2004) . . . . . . . . 13, 15

*Shroyer v. New Cingular Wireless Servs., Incorporated,* 622 F.3d 1035 (9th Cir. 2010) . . . . 28

*Starr v. Baca,* 652 F.3d 1202 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Swift v. Tyson,* 41 U.S. 1 (1842) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States ex rel. Newsham v. Lockheed Missiles and Space Company,*
      190 F.3d 963 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 25

*Vess v. Ciba-Geigy Corporation USA,* 317 F.3d 1097 (9th Cir., 2003) . . . . . . . . . . . . . . . . . . 29

*Walden v. Fiore,* 134 Southern Ct. 1115 (2014)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Wells Fargo and Company v. Wells Fargo Exp. Company,* 556 F.2d 406 (9th Cir 1977) . . . . . 14

*Wilson v. Hewlett-Packard Company,* 668 F.3d 1136 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . 28

David P. Lennon, OSB # 125575
Lennon & Klein, P.C.
3922 Bellinger Lane
Medford, OR 97501
Telephone:     212-465-2020
Facsimile:     212-202-5337
E-mail:        david@lennon-klein.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| ORBITAL PUBLISHING GROUP, INC., a New York corporation, and LIBERTY PUBLISHERS SERVICE, INC., a New York corporation, | Case No. 1:15-cv-00480-CL |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| -against- | **(ORAL ARGUMENT REQUESTED)** |
| BRIDGET WELLS, individually, and PERIODICAL WATCHGUARD, LLC., a North Carolina limited liability company, | |
| Defendants. | |

## PRELIMINARY STATEMENT

This memorandum of law is respectfully submitted on behalf of Plaintiffs Orbital

Publishing Group, Inc. ("Orbital") and Liberty Publishers Service, Inc. ("Liberty") in opposition

to the motion by defendants Bridget Wells and her company, Periodical Watchguard, LLC. ("Periodical Watchguard") to dismiss the complaint.

Plaintiffs Orbital and Liberty are companies that marketed and sold magazine subscriptions to consumers through direct mail. Plaintiffs successfully engaged in this business until they were targeted by defendant Bridget Wells and her company, defendant Periodical Watchguard. With the intent of putting plaintiffs out of business, defendants flooded magazine publishers, plaintiffs' banks, attorney generals and other government agencies across the country with fraudulent proclamations about plaintiffs' business practices. Defendants maliciously claimed that plaintiffs were mailing out fraudulent solicitations, engaging in mail fraud, and defrauding customers by not fulfilling their magazine orders and stealing their money – all of which was untrue. As a result of defendants' tortious interference, publishers and their clearinghouses terminated their relationship with plaintiffs, one bank after another closed plaintiffs' bank accounts and terminated their relationships, and state attorney generals across the country have initiated investigations or actions against plaintiffs. Unable to sustain business under the weight of these fraudulent allegations, plaintiffs ceased doing business.

Defendants motion to dismiss should be denied because:

      a.    This court has jurisdiction over defendants Wells and Periodical Watchguard in Oregon as these defendants engaged in tortuous acts in Oregon which gave rise to the action and it is not unreasonable for them to have to defend this action in Oregon;

      b.    Venue is proper in Oregon because defendants committed acts in Oregon and the plaintiffs, which are the subject of the action, are located in Oregon;

c. The Oregon Anti-Slapp statute does not preclude the prosecution of this actions because ORS 31.150 — an Oregon procedural statute and not a substantive statute — should not apply to this federal court action; and even if ORS 31.150 did apply, Defendants have not demonstrated that their actions are protected under Oregon's Anti-SLAPP and Plaintiffs have demonstrated that there is a probability that they will prevail on the claim; and

d. Plaintiff stated a claim for tortious interference with business relationships that is not time barred since there can be no issue that defendants Wells and Periodical Watchguard has continued their tortious towards Plaintiffs earlier this year.

### THE ALLEGATIONS OF THE
### COMPLAINT AND THE BACKGROUND

The allegations are contained in the complaint, to which the Court is respectfully referred. A copy of the complaint is annexed to the Declaration of David P. Lennon dated August 14, 2015 as Exhibit A.[1] For the convenience of the Court, a summary of the salient allegations of the complaint is set forth below.

Plaintiff Orbital is a New York corporation and that had places of business in Reno, Nevada and in Medford, Oregon. Orbital was incorporated and started doing business in 2010. Orbital was engaged in the business of marketing and selling magazine subscriptions by direct mail. Orbital and Liberty were independent magazine subscription agents. Orbital ceased

---

[1] The Declaration of David P. Lennon dated August 14, 2015 is hereinafter referenced as "Lennon Decl." and the exhibits attached to the Lennon Decl. are referenced as "Lennon Decl., Ex. ___."

operations in or about 2012 when it was no longer able to open and maintain banking relationships in Oregon.

Plaintiff Liberty is a New York corporation with its place of business in Medford, Oregon.  Liberty was also engaged in the business of marketing and selling magazine subscriptions by direct mail. Liberty was incorporated in 2011 and started doing business when it became apparent that Orbital would not be able to continue to maintain bank accounts. Liberty acquired certain assets and liabilities of Orbital.  Liberty ceased operations in or about 2014 when it was unable to open and maintain banking relationships in Oregon.

Defendant Bridget Wells is the owner and founder of Periodical Watchguard located in North Carolina. Periodical Watchguard was purportedly established to assist publishers in identifying "fraudulent sales" and to educate consumers in how to recognize the difference between a "good deal" and a "scam."  (See the printout of the Periodical Watchguard's website, Lennon Decl., Ex. B.)[2]

Wells, both individually and through her company, Periodical Watchguard, set out on a four-prong course of attack to put Orbital and Liberty out of business by disseminating false and disparaging information about their business practices to:  (1) members of the publishing industry, (2) Attorney Generals in numerous states, (3) Orbital and Liberty's banks and (4) other government agencies, including the U.S. Postal Service.

Magazine subscription agents, such as Orbital and Liberty, solicit consumers through direct mail to sell subscriptions for magazines whose publishers accept orders from independent

_____

[2] After the commencement of this action, Wells and Periodical Watchguard changed their website to remove some the tortious references to Plaintiffs.  The version submitted herewith is how the defendants' website existed prior to this action.

agents.  Orbital and Liberty's direct mail solicitations clearly state that they are independent agents that may not have a direct relationship with the publishers.  (See an example of Plaintiffs' direct mail solicitation, in blank, Lennon Decl., Ex. C.)

Typically, upon receipt of orders from consumers, magazine subscription agents forward the orders to clearing firms that work directly with publishers, or other clearing firms, together with the previously agreed upon remittance. There may be multiple levels of clearing firms handling the order before the publisher receives it depending on which clearing firm has the direct relationship with the publisher. Once the publisher (or its designee) processes the order, the consumer begins to receive the magazine.  Magazine subscription agents make their profit on the difference between the remittance paid to the clearing firm and the price they sell the magazine subscriptions for, less the cost of operations and marketing.

**Defendants' Improper Conduct**
**Within the Publishing Industry**

Beginning in and around 2010, Wells set out on a course of contacting publishers and falsely asserting, *inter alia*, that Orbital and then Liberty were "illegitimate businesses" that were defrauding customers.  Wells undertook the malicious campaign to put Orbital and Liberty out of business to improperly divert business away from Orbital and Liberty to those clearing firms, agents, and publishers in which she has an interest or that pay her.

Specifically, defendants falsely asserted to publishers and other members of the publishing industry that Orbital and Liberty were engaged in the following fraudulent conduct:

a.      mailing solicitations to customers that purported to be renewal solicitations direct from the publishers thereby defrauding consumers;

b.     by collecting fees from consumers for magazine subscriptions and

only remitting certain orders to clearing firms and stealing the rest of the

consumers' money; and

c.     committing "mail fraud."

On defendant Periodical Watchguard's website, defendants specifically identified

plaintiffs under the heading "Scams" for direct mail and made the following statement:

Bogus Renewal Solicitations

Many consumers are receiving solicitations that
appear to be a request for renewal.  These
solicitations generally come from the same location
– White City, Oregon.  In the recent past, the
solicitations were mailed from Reno, Nevada.

The solicitations have a variety of names, but the
parent company is Orbital Publishing Group.  If
your magazine has been targeted by these rogue
sellers, please contact us to discuss the latest
developments.[3]

Wells encouraged publishers to take steps to ensure that their magazines not be sold

through Orbital and Liberty because they were purportedly "illegitimate businesses."  Wells

encouraged publishers to take all steps necessary to ensure that their clearing firms and agents

not deal with Orbital and Liberty.

In or about December 2014, Wells disseminated an email to members of the publishing

industry inviting them to a seminar in New York regarding, *inter alia*, fraud in the magazine

---

[3] Orbital and Liberty both used clearing firms located in White City, Oregon. [Footnote
not in original.]

industry and what steps should be taken.  On January 21, 2015, Wells conducted that seminar in New York City entitled, "Fraud/Bogus Renewal/Unauthorized Sellers: Lunch with an Expert."[45]

Throughout that seminar, and in conjunction with the alleged fraud being perpetrated against publishers, defendants repeatedly made reference to "Liberty Publishers Service and Orbital Publishing Group" as being the leading culprits.

Defendants fraudulently misrepresented to the attendees at the seminar that plaintiffs only clear a small percentage of their orders and steal the balance of the money collected. To lend an air of credibility to her false statements, defendants misrepresented that they were working with the U.S. Postal Service to put an end to plaintiffs' purported ongoing mail fraud.

Wells advised and encouraged the attendees at the seminar and all those publishers she contacts, to take action to put Orbital and Liberty out of business to stop the "mail fraud" by contacting the U.S. Postal Service.

Defendants also urged the attendees at the seminar that both the publishers and their customers should call their Attorney General and claim that they have been defrauded if they receive a solicitation from either Orbital or Liberty.  Wells provided the attendees at her seminar with the names of certain companies who were purportedly clearing magazine orders for Orbital

---

[4] During the seminar, in addition to her tortious statements regarding Plaintiffs, she made numerous false and disparaging factual assertions regarding the people and the companies that worked with Plaintiffs.  Just as an example, she stated that Dennis Simpson, a client of David Lennon (attorney for Plaintiff in this action) was David Lennon's law partner.  Mr. Simpson is not even an attorney and is certainly not Mr. Lennon's law partner.  This is but an example of the fabrications uttered by Defendant at the seminar.

[5] Plaintiffs obtained a recording of Defendant's January 21, 2015 seminar.  Accordingly, at the appropriate hearing, the court will be able to hear in Defendant Wells' own words the lies and misrepresentations she espouses regarding Plaintiffs and those companies and people that work with Plaintiffs.

Page 7-    PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION
             TO DISMISS

or Liberty and advised them not to do business with those companies, so that no company would do any business with plaintiffs. During her seminar, Wells stated that while she was employed by a major publisher, Hearst Publications, she was unable to convince Hearst lawyers to bring action against the magazine subscription agents. (Of course, the attorneys would not bring action against the agents because the agents were not engaging in any activity which would subject them to a law suit.) Wells stated, "I started my own company so I wouldn't have to run into that." In her own words she stated that although she knew that there was no legitimate legal basis for bringing claims against Plaintiffs to stop their activity, she decided to start her own company to take matters into her own hands outside of the judicial process. [6]

Defendants intentionally interfered in the business relations between plaintiffs and publishers and clearing firms who deal with Orbital and Liberty for the sole purpose of putting plaintiffs out of business and did so through improper means by telling falsehoods about Plaintiffs.

As a result of defendants' conduct, plaintiffs suffered non-economic and economic damages, including lost income and impairment of future income.

---

[6] She even referenced prior litigations where publishers brought actions against magazine subscription agents which resulted in the court dismissing those actions. Again, frustrated with the lack of being able to use the judicial process because the magazine subscription agents engage in no wrongful conduct, Wells decided to take matters into her own hands to stop the magazine subscription agents.

**Wells' Improper Conduct**
**with Attorney Generals' Offices**

Indeed, at here seminar in New York in January, Wells was boasting that she was getting a contract from the State of Oregon to work with the Oregon Department of Justice to prosecue Plaintiffs.

Indeed, at the January 2015 seminar, Defendant Wells explained how she is "in final negotiations for the contract with Oregon to be a witness for them." She identified Geoffrey Darling, Chief Investigator for the Oregon Department of Justice, as being "another key player in this game, for lack of a better way of saying it. Um, and I already told him when I saw him I didn't, I didn't care about personal space, I was giving him a big old hug and kiss just because he's, you know, interested and, wanting to carry on. So, anyway, working with him." [7]

Moreover, at the seminar, Wells stated that the authorities need to pursue Plaintiffs criminally: "it needs to be criminal." Notwithstanding Wells advocating for the criminal prosecution of Plaintiffs and those that they worked with, there is no criminal prosecutions against Plaintiffs, or those that they work with, as they did not commit any crimes, let alone violate the law.

Defendants encouraged publishers to contact the attorney generals' office in their respective states to file a complaint about the allegedly fraudulent business practices of Orbital and Liberty and assert they had been harmed.

---

[7] It is noteworthy that in her declaration in support of her motion to dismiss, Wells stated that she has not even been to Oregon (other than a two day vacation six years ago), yet in January in New York she told a room full of people that when she saw Geoffrey Darling, Chief Investigator for the Oregon Department of Justice she was going to give him a hug and a kiss.

Wells encouraged publishers to contact the Attorney General's office to complain about fraudulent acts perpetrated by Orbital and Liberty notwithstanding that Orbital and Liberty's customers paid for magazine subscriptions and either received magazines or received refunds where appropriate.

Wells encouraged publishers to direct their customers to contact the Attorney General's office in their respective states to complain about the allegedly fraudulent business practices of Orbital and Liberty, and to assert they had been harmed. In response to the false, disparaging and malicious information Wells was disseminating about Orbital and Liberty, and at defendants' urging, publishers and/or their customers were filing baseless complaints with Attorney Generals' offices across the country.

As a result of defendants' actions, Attorney Generals' offices across the country received an increase in the number of complaints that were filed against Orbital and Liberty. Wells personally contacted the Attorney Generals in multiple states and misrepresented, *inter alia*, that Orbital and Liberty are illegitimate companies that are mailing fraudulent solicitations to consumers.

Based on the false and disparaging information provided by Wells, these Attorney Generals opened investigations into Orbital and Liberty. Wells is providing these Attorney Generals with information as to whom Orbital and Liberty do business so that the Attorney Generals would also target them for investigation.

Based on the false and disparaging information provided by Wells, these Attorney Generals opened investigations into numerous companies with whom Orbital and Liberty did business.

These Attorney Generals are contacting Orbital and Liberty's vendors, members of the publishing industry, banks and customers as part of their investigations into purported fraud. These investigations had a chilling effect on Orbital and Liberty's business relationships with its banks, members of the publishing industry, vendors and customers.

As a result of Wells' fraudulent misrepresentations to Attorney Generals' offices, and in answer to these investigations, Orbital and Liberty have had to utilize their funds and resources to defend against these false accusations of fraud.

**Wells' Improper Conduct With Banks**

Wells contacted Orbital and Liberty's banks and fraudulently misrepresented, *inter alia*, that Orbital and Liberty were using their bank for improper purposes to launder money and defraud consumers. (While Wells states in her declaration that "to the best of [her] knowledge she never contacted any bank in Oregon, given that every bank with which Plaintiffs maintained accounts were closed without explanation, it appears that Wells either directly or caused other people to raise issues with Plaintiffs' banks. Moreover, Wells states that to the best of her knowledge she did not contact any "Oregon" banks, she does not deny that she contacted banks. Many of the banks with whom Plaintiffs conducted business are national banks such as Chase, Bank of America and Wells Fargo.)

Wells' encouraged publishers to contact Orbital and Liberty's banks and claim that plaintiffs are defrauding them. Wells' also encouraged publishers to enlist their customers to contact Orbital and Liberty's banks and claim that plaintiffs are defrauding them.

As a result of Wells' misrepresentations and incitement, Orbital and Liberty's banks have been contacted by publishers and/or their customers claiming that they have been defrauded by Orbital and/or Liberty.

As a result of Wells' conduct, banks have terminated their business relationships with Orbital and Liberty and have terminated their bank accounts. As a result, Orbital and Liberty were unable to deposit checks from customers.

As a result of Wells' conduct, Orbital and Liberty were forced to jump from bank to bank and ultimately they were unable to open accounts at any bank whatsoever thereby forcing them out of business.

As a result of Wells' conduct, Orbital and Liberty have suffered non-economic and economic damages to their business, including disruption to their business, delay of submitting orders due to the inability to submit the required remit to clearing firms, legal fees to compel banks to honor outstanding checks upon termination of accounts, and lost income and impairment of future income.

## ARGUMENT

### POINT I

### THIS COURT HAS PERSONAL JURISDICTION OVER WELLS AND PERIODICAL WATCHGUARD

Federal courts may exercise personal jurisdiction over a non-resident defendant where the state's long-arm statute confers jurisdiction over the defendant and the exercise of jurisdiction does not violate due process. *Data Disc. Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1286 (9th Cir. 1977). Because Oregon law confers jurisdiction over an out-of-state defendant that is coextensive with due process, the court need only analyze whether the exercise of jurisdiction comports with due process. *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 n.l (9th Cir. 1990).

Due process requires a court to have general or specific jurisdiction over a defendant to avoid "offend[ing] traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945) (citations omitted). A court has general jurisdiction where the defendant's contacts with the forum are "substantial" or "continuous and systematic." *Decker Coal Co. v. Commw. Edison Co.*, 805 F.2d 834, 839 (9th Cir. 1986). A court has specific jurisdiction over a defendant if "there is a strong relationship between the quality of the defendant's forum contacts and the cause of action." *Id.* Plaintiffs contend that this court has specific personal jurisdiction over Defendants.

In the Ninth Circuit, courts apply the following three-part test when determining whether they have specific jurisdiction over a defendant: (1) The nonresident defendant must do some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of the forum; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) exercise of jurisdiction must be reasonable. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir., 2004); *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).

The plaintiff bears the burden of satisfying the first two prongs of the test. If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state. If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004), citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

In evaluating defendant's motion, the court may consider evidence presented in affidavits to assist it in its determination and may order discovery on the jurisdictional issues.[8] *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir.2001), citing *Data Disc, Inc. v. Systems Technology Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir.1977). If the court decides the motion based on the pleadings and affidavits submitted by the parties without conducting an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss. *Id.*, *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir.1995). In the absence of an evidentiary hearing, the court accepts uncontroverted allegations contained within the plaintiff's complaint as true, and resolves conflicts between statements contained within the parties' affidavits in the plaintiff's favor. *Bates v. Bankers Life & Cas. Co.*, 993 F. Supp.2d 1318 (D. Or. 2014).

---

[8] During conferral with opposing counsel, Plaintiffs' counsel requested limited discovery on the personal jurisdictional issue which defendants' counsel declined. During a preliminary conference with the court on July 20, 2015, Plaintiffs' counsel then requested leave of the court to conduct limited jurisdictional discovery. The court denied Plaintiffs leave to conduct any jurisdictional discovery at that time in connection with the instant motion.

To the extent the court determines that a greater showing is necessary to establish personal jurisdiction, Plaintiffs request leave to conduct limited discovery on the jurisdictional issue. *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 430 n.24 (9th Cir 1977) ("Discovery, however, 'should be granted where pertinent facts bearing on the question of jurisdiction are controverted . . . or where a more satisfactory showing of the facts is necessary.'"); *LaDue v. City of Talent*, No. 1:14-CV-01421-CL (D. Or. 2015) (Clarke, J.) ("Based on the evidence and allegations proffered by both parties, it is not clear to the Court 'that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction.' . . . Rather than rule on an incomplete record, the Court will allow limited jurisdictional discovery.").

**A.      Purposeful Availment or Direction Generally**

As the Ninth Circuit explained in *Schwarzenegger*,

> We often use the phrase "purposeful availment," in shorthand
> fashion, to include both purposeful availment and purposeful
> direction,, but availment and direction are, in fact, two distinct
> concepts. A purposeful availment analysis is most often used in
> suits sounding in contract. A purposeful direction analysis, on the
> other hand, is most often used in suits sounding in tort.

*Schwarzenegger*, 374 F.3d at 802 (9th Cir. 2004) (citations omitted).  This is the exact analysis

that the United States Supreme Court directed courts to use for decades to determine if there is

jurisdiction and *Walden v. Fiore,* 134 S. Ct. 1115 (2014) has not changed that analysis.  *Walden*

is not new law.  *Walden* simply explained that the lower court misapplied the law and that "the

well established principles of personal jurisdiction are sufficient to decide this case." *Walden v.

Fiore*, 134 S. Ct. 1115 (2014).  In *Walden*, the Court held that the "proper focus of the

'minimum contacts' inquiry in intentional-tort cases is 'the relationship among the defendant,

the forum, and the litigation.'" *Id.* citing *Calder v. Jones*, 465 U. S. 783, 788 (1984). Here,

Defendants' actions towards the Plaintiffs in connection with Oregon demonstrates that there is

specific jurisdiction.

In *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985), the Supreme Court held:

> Where a forum seeks to assert specific jurisdiction over an
> out-of-state defendant who has not consented to suit there, this
> "fair warning" requirement is satisfied if the defendant has
> "purposefully directed" his activities at residents of the forum,
> *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct.
> 1473, 1478, 79 L.Ed.2d 790 (1984), and the litigation results from
> alleged injuries that "arise out of or relate to" those activities,
> *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408,
> 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404(1984).

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774-75, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)

(finding purposeful direction where defendant published magazines in Ohio and circulated them

in the forum state, New Hampshire); *accord Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 899 (9th Cir.2002) (finding purposeful direction where defendant distributed its pop music albums from Europe in the forum state, California); *see also World-Wide Volkswagen*, 444 U.S. at 297-98, 100 S.Ct. 559 (noting that a "forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State"); *Plant Food Co-Op v. Wolfkill Feed & Fertilizer Corp.*, 633 F.2d 155, 158-60 (9th Cir.1980) (relying on this language in *World-Wide Volkswagen* to hold that a Canadian fertilizer distributor that shipped defective or mislabeled fertilizer to Montana may properly be subject to personal jurisdiction there).

The Supreme Court has held that due process permits the exercise of personal jurisdiction over a defendant who "purposefully direct[s]" his activities at residents of a forum, even in the "absence of physical contacts" with the forum. *Burger King*, 471 U.S. at 476, 105 S.Ct. 2174 (*citing Keeton*, 465 U.S. at 774-75, 104 S.Ct. 1473)

*Walden* does not support the defendants' argument that there is no jurisdiction because — unlike in *Walden* — defendants themselves established their contacts with Oregon.  In *Walden,* the defendant had absolutely no contacts with the venue state.

In the case at bar, Wells and Periodical Watchguard admittedly contracted with the Oregon Department of Justice to give testimony in an Oregon court on behalf of the Oregon Department of Justice against defendants Orbital and Liberty.  Wells, as the president of Periodical Watchguard, on November 7, 2013, actually gave live voluntary testimony by telephone in the Jackson County Circuit Court in Oregon in a case involving one of Plaintiffs' vendors, Customer Access Services, Inc., a clearing firm.  In her declaration in support of her

motion to dismiss this action, Wells states that case did not "involve these Plaintiffs" but that is not true. After she was sworn in by Judge Gerking, Wells testified regarding defendant Orbital's role in the magazine industry, that Orbital was not authorized to solicit magazine subscription orders and that Orbital charged amounts different that what the publishers charge. She testified as follows:

> Q. So can you tell the judge, before you tell us anything that you know about it, how you became aware of the name Shannon Balero?
>
> A. Yes. With my company Periodical Watchguard, it is my job to seek out those owners, those runners, those managers of companies that publishers -- my clients have asked me to seek. In doing research on corporate entities, business entities and so forth, I came across the name of Shannon Balero and the address for her with regard to a company called at the time Orbital Publishing Group going under a bunch of AKAs.

(Wells Tr. 15, Lennon Decl., Ex. D.) She also testified that Orbital did not have authorization to solicit magazine subscription order which not true.

> Q. And do you know they were not authorized?
>
> A. I know that no publisher has directly authorized Orbital Publishing Group to sell their titles.
>
> Q. You just testified you know who the agent was; you just testified it was Orbital Publishing Group. Is that -- do you now recollect that was the agent?
>
> A. I recollect that that is what -- you keep using the word agent, and I disagree with the word agent.
>
> Q. Well, as to -- was that the plaintiff in the case against Bank of America?
>
> A. I believe that it was Orbital Publishing Group that was the plaintiff in the case of Bank of America.
>
> Q. And you testified that you are not aware of any publishers that authorized the Orbital Publishing Group to sell those magazines; is that right? Was that your testimony?

A. My testimony is that I know of no publisher who has directly authorized those sales; that is correct.

(Wells Tr. 56-57, Lennon Decl. Ex. D.) Wells also again testified that Orbital was not "authorized" and that consumers that purchased magazines from Orbital did not get their magazine – both of which was not true.

Q. Did you talk to any clearing firms to see if they authorized Orbital Publishing Group to sell certain magazines?

A. Yes, I have spoken to many of those, all of the major ones, and said have you authorized these? If so, this publisher does not -- because I can only speak for my publishers. And Hearst when I worked there, I could speak for all 19 titles. We do not want that business. This is not authorized business; I don't want it.

Q. Now, you identified two problems with consumers. One is that they do not get the magazine and that the other problem is that they pay a price different than what the publisher authorizes?

A. Yes.

Q. Okay. With respect to the Orbital Publishing Group, were you aware of any instances where consumers didn't get the magazine?

A. Yes.

Q. Are you aware of complaints by publishers that Orbital charged a different amount than publishers --

A. Yes.

Q. -- wanted?

A. Yes.

(Wells Tr. 59-60, Lennon Decl., Ex. D.)

Wells claims that she recently contracted to give expert testimony at the Oregon Department of Justice's request, but Wells fails to advise the court that she had been working

with the Oregon Department of Justice for years in trying to put the Plaintiffs out of business. (See Lennon Decl., Ex. E)

In addition to testifying about Plaintiffs and assisting Oregon the Department of Justice, Wells and Periodical Watchguard also sent numerous cease and desist letters to defendants in Oregon. (Lennon Decl., Ex. F)

In her declaration, Wells claims that she that "to the best of [her] knowledge" she has not contacted any of defendants' banks in Oregon, but does not deny that she contact defendants bank in Oregon. Since defendants were established, they have lost all of their banking relationships with many different banks. Plaintiffs believe that they lost these banking relationships as a result of defendants contacting Plaintiffs' banks directly or directing publishers, or consumers to contact Plaintiffs' banks.

Based on the allegations and evidence that Defendants engaged in activity in Oregon giving rise to Plaintiffs' claims, as well as engaging activity outside of Oregon which gives rise to Plaintiffs' claims, Plaintiffs have demonstrated that Defendants have purposely availed themselves to Oregon. These contacts are not contacts based on the conduct of Plaintiffs or third parties; these are contacts as a result of Defendants' purposeful availment.

**B.      Defendants' Conduct With Oregon Gives Rise to Plaintiffs' Claims**

The Defendants' contacts with Oregon are not limited to "phone calls" she purportedly had with the Oregon Department of Justice. As the court can see from the volume of correspondence between Defendants and Oregon Department of Justice, her communication was not limited to phone calls. (See Lennon Decl., Ex. E)

Here, Defendants contracted with Oregon Department of Justice to assist them in its investigation and prosecution against Plaintiffs based on the false and misleading information

provided by Defendants about Plaintiffs.  Similarly, Wells testified in Oregon State Court

regarding Plaintiffs' activities.  Accordingly, there are far more than "minimum" contacts — all

that is required — between and among the forum, Defendants and Plaintiffs' claims.

Accordingly, Plaintiffs have established a prima fascia showing of personal jurisdiction.

**C.      It Is More Than Reasonable for the
          Court to Find Jurisdiction Over Defendants**

To determine reasonableness such that the exercise of jurisdiction comports with "fair

play and substantial justice," once Plaintiff establishes the first two prongs of the specific

jurisdiction test, it is Defendants' burden to "present a compelling case" that the reasonable

exercise of jurisdiction would not be reasonable.  *Bates v. Bankers' Life and Casualty Co.,* 993 F.

Supp 2d, 1318, 1333 (D. Or. 2014)*,* quoting *Burger King v. Rudzewicz,* 471 U.S. 462, 476-78

(1985).  In determining reasonableness, the Ninth Circuit has identified seven factors for the

court to consider in determining whether or not it would be reasonable for Defendants to defend

the action in the forum state.  The court need consider: (1) the extent of the Defendants'

purposeful injection into the forum state's affairs; (2) the burden on the Defendants to defend the

suit; (3) the extent of the conflict with the sovereignty of the Defendants' state; (4) the forum

state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the

controversy; (6) the importance of the forum to the Plaintiffs' interest in obtaining convenient

and effective relief; and (7) the existence of an alternative forum. *Shute v. Carnival Cruise Lines*,

897 F 2d 377, 386 (9th Cir. 1990), citing *Federal Deposit Insurance Corp. v. British - American

Insurance Co., LTD*, 828 F.2d 1439, 1442 (9th Cir. 1987).  The court must balance the seven

factors to determine whether the exercise of jurisdiction would be reasonable. *Id.*

There can be no issue of the Defendants' purposeful injection into the forum state given

the voluntary testimony proffered in the Jackson County Circuit Court and the voluntary

agreement to testify on behalf of the Oregon Department of Justice in another case in Oregon State Court. Furthermore, Defendants injected themselves into Oregon's affairs by sending numerous cease and desist letters on behalf of purported clients to Plaintiffs and other companies that work Plaintiffs. It is inconceivable how Defendants can claim that they have not intentionally injected themselves into the affairs of the forum state. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774-75 (1984).

The burden on Defendants Wells and Periodical Watchguard is substantial given that they voluntarily agreed to testify in two separate court proceedings against Plaintiffs. They can hardly be heard to complain to having to defend themselves in Oregon having injected themselves into Oregon's affairs. There is certainly no conflict with North Carolina sovereignty, the Defendants' state, as none of the contacts or claims relate to or arise from any relationship with North Carolina. There is certainly an interest in having these claims adjudicated in Oregon where all of the Plaintiffs are located as well as many of the companies with which Plaintiffs conducted their business. There are no companies with which Plaintiff conduct their business in Defendants' home state of North Carolina. Given that Plaintiffs and many of the companies with whom they conduct their business are located in Oregon, there would be an efficient resolution of the controversy here and it would be difficult for Plaintiffs, as wells as their numerous witnesses, to have to testify in another state. While there may be an alternative forum to Plaintiff to assert these claims, any alternative venue lacks the interest that exists in Oregon with respect to Plaintiffs. While New York may be a viable alternative venue, the fact that virtually all of the witnesses from Plaintiffs, those companies that they work with, the Oregon Department of Justice with whom Defendants contracted to give testimony, and the numerous banking relationships that Plaintiffs had that were destroyed, are all located in Oregon.

Accordingly, it is not unreasonable for Defendants to defend this action here

## POINT II

## VENUE IS PROPER IN OREGON

Venue is proper in the District of Oregon because "a substantial part of the events or omissions giving rise to the claim occurred" in Oregon. 28 U.S.C. § 1391(b)(2).  As admitted by Defendants, Defendant Wells testified in the Jackson County Circuit Court in Oregon regarding Plaintiffs' business practices.  Moreover, Defendants admit that they "contracted" to give testimony and to assist the Oregon Department of Justice in a case to be filed in Oregon to shut down Plaintiffs' business and the businesses of the companies with which Plaintiffs worked.

Accordingly, venue is proper is the District of Oregon.

In the alternative, Defendants ask the court to transfer this case to the District of North Carolina pursuant to 28 U.S.C. § 1404(a) because the District of Oregon is purportedly an inconvenient venue.  Defendants' argument that Oregon is an inconvenient venue to litigate is belied by the fact that Defendant Wells, has already voluntarily testified in an Oregon state court regarding Plaintiffs' purported business practices and Defendants contracted with the Oregon Department of Justice to testify in another state court action against Plaintiffs and those with whom they work.  Moreover, virtually all of the witnesses, including the banks that terminated their relationships with Plaintiffs based on Defendants' conduct are located in Oregon, as are all of the former officers and employees of Plaintiffs and many of the companies with whom they worked.  There is nothing in North Carolina except for Defendants.

## POINT III

## OREGON'S ANTI-SLAPP STATUTE DOES NOT APPLY, AND EVEN IF IT DOES APPLY, PLAINTIFFS DEMONSTRATED A PROBABILITY THAT THEY WILL PREVAIL

**A.      Oregon's Anti-SLAPP Statute Should Not Even Apply in Federal Court**

Initially, Oregon's procedural Anti-SLAPP Statute should not apply to this action pending in federal court. While Plaintiffs recognize the holding of *United States ex rel. Newsham v. Lockheed Missiles and Space Co.*, 190 F.3d 963, 973 (9th Cir. 1999), and its progeny, including *Metabolic Research, Inc. v. Ferrell*, 693 F.3d 795, 796 (9th Cir. 2012) (cited by Defendants), the doctrine as to whether a state's Anti-SLAPP statute should apply in Federal court should be reconsidered in the Ninth Circuit.

The seminal case of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), overruling *Swift v. Tyson*, 41 U.S. 1 (1842), held that state law governed substantive issues in diversity cases. It is now just as axiomatic that procedure in federal court is governed by federal law and not state law.  *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415 (1996); *see also Hanna v. Plumer*, 380 U.S. 460 (1965) ("*Erie* and its offspring cast no doubt on the long recognized power of Congress to prescribe housekeeping rules for federal court.")

In *Makaeff v. Trump University, LLC*, 715 F.3d 254 (9th Cir. 2013), Chief Judge Kozinski, joined by Judge Paez, in a concurrence opinion on the application of Nevada's Anti-SLAPP statute stated that he believe *Newsham* is wrong and should be reconsidered.  Judge Kozinski stated that under *Erie*, Anti-SLAPP statutes create no substantive rights but merely provide procedural mechanisms for vindicating existing rights.  *Makaeff*, 715 F.3d at 273. Judge Kozinski stated:

> The language of the statute is procedural: its mainspring is a "special motion to strike"; it contains provisions limiting discovery; it provides for sanctions for

parties who bring non-meritorious suit or motion; the court's ruling on a the potential success of Plaintiff's claim is not "admissible in evidence at any later stage of the case"; and an order granting or denying the special motion is immediately appealable [in California]. The statute deals only with the conduct of the lawsuit; it creates no rights independent of existing litigation; and its only purpose is the swift termination of certain lawsuits the legislators believe to be unduly burdensome. It is codified in the State Code of Civil Procedure and the California Supreme Court has characterized it as a "procedural devise to screen out merit-less claims." See *Kibler v. N. Inyo County Local Hospital Dist*., 39 Cal 4th 192, 46 Cal Rep. 3d 41, 138 P 3d 193, 198 (2006).

*Maekeff* 715 F.3d at 273. Judge Kozinski determined that the Anti-SLAPP statute is quintessentially procedural and should have no application in federal court. Judge Kozinski stated that federal courts must ignore state court's rules of procedures because it is Congress that has plenary authority over the procedures employed in federal court and this power cannot be usurp by the states.

> The federal rules aren't just a series of disconnected procedural devises. Rather, the Rules provide an integrated program of pre-trial, trial and post-trial procedures to ensure "just, speedy, and inexpensive determination of every action and proceeding." *See* Fed.R.Civ.P. 1. Pre-discovery motions, discovery, summary adjudication, and trial follow a logical order and pace so that cases proceed smartly towards final judgment or settlement.
>
> The California Anti-SLAPP Statue cuts an ugly gash through this orderly process.

*Id* at 274. Indeed, Judge Kozinski found that this hybrid substantive/procedural scheme was further undermined by the Ninth Circuit's decision in *Metabolife International, Inc. v. Wornick*, 264 F.3d 832, 845 (9th Cir. 2001), which held that the discovery limiting aspects of the anti-SLAPP statute do not apply in federal court. Judge Kozinski stated unequivocally, "*Newsham* was a big mistake." Judge Paez fully joined in Chief Judge Kozinski's concurrence that *Newsham* should be overturned. *Maekeff*, 715 F.3d at 275.

Indeed, Chief Judge Kozinski's position on *Newsham* has been accepted in other circuits and by district courts where circuits courts have not yet rendered a decision on the applicability of Anti-SLAPP statutes in federal court. *See Abbas v. Foreign Policy Grp., LLC.*, No. 12-cv-01565 (D.C. Cir. April 24, 2015) (The D.C. Anti-SLAPP statute does not apply in federal court since Fed.R.Civ.P. 12 and 56 already address the same procedural issue.); *Royalty Network, Inc. v. Harris*, 756 F.3d 1351 (11th Cir. 2014) (Georgia's Anti-SLAPP statute does not apply in diversity cases in federal court.); *Unity Healthcare, Inc. v. Cnty. of Hennepin*, Case No. 14-CV-114 (JNE/JJK) (D. Minn. June 25, 2015) (Minnesota's Anti-SLAPP law is inapplicable because it conflicts with Federal Rule of Civil Procedure 56.).

Plaintiffs respectfully submit that *Newsham* should be reversed by the Ninth Circuit, or the Supreme Court, and that Oregon's anti-SLAPP statute should not apply in federal court.

**B.     If the Court Determines That Oregon's Anti-SLAPP Statute Even Applies in Federal Court, the Anti-SLAPP Statute Does Not Apply in this Case as There Is No Protected Speech at Issue**

Notwithstanding that the Oregon Anti-SLAPP statute should not apply in federal court as a matter of federal procedural law, in the instant case, the Oregon Anti-SLAPP statute does not apply to this action. Defendants' purported speech is not protected under the statute.

Defendants claim that the their tortious conduct is covered by Anti-SLAPP sections (b) regarding statements to "legislative, executive or judicial bodies or other proceedings authorized by law" and (d) "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right to free speech in connection with a public issue or an issue of public interest." O.R.S. § 31.150(2)(b) and(d).

Defendants misunderstand the grounds of plaintiff's claim. Defendants' "lobbying" of attorney generals throughout the country is only part of the improper interference with plaintiffs'

business relations. As alleged in the complaint, defendants undertook their malicious campaign to put plaintiffs out of business by making false and disparaging statements to publishers and other members of the publishing industry. (Cmplt, ¶ 20.)

The statute allows Defendants to make a special motion to protect a person for exercising free speech or participating in judicial proceedings. The nature of Plaintiffs' instant claims is not related to Defendants' free speech or for testimony in connection with a judicial proceeding. The gravamen of Plaintiffs' claim is that Defendants are engaged in a crusade to put Plaintiffs (and those with which they do business) out of business. Defendants are engaged in their own commercial enterprise — buy charging publishers and government agencies — to provide their services to put the Plaintiffs out of business notwithstanding that Plaintiffs were engaged in a legitimate endeavor and simply provided competition to Defendants' so called "clients" and others who pay Defendants for their purported "protection." It is Defendants that have created the aura of purported illegitimacy regarding Plaintiffs' business. It is Defendants that have solicited the publishers to quell the competition created by the Plaintiffs' commercial endeavor. There are no First Amendment concerns at issue in this case.

These claims are not subject to Oregon's Anti-SLAPP statute. Accordingly, defendants have failed to carry the burden to demonstrate that plaintiffs' claims are subject to Oregon's Anti-SLAPP statute. O.R.S. § 31.150(3).

**C.     Assuming Defendants Carry Their Burden to Show That Their Conduct and Statements Are Covered by O.R.S. § 31.150(3), Plaintiffs Have Demonstrated A Prima Facie Case**

Plaintiffs have shown that Defendants are making false statements about Plaintiff business practices to publishers and are lobbying Attorney Generals purportedly on behalf of those publishers to put Plaintiffs out of business. Defendants are disseminating false information

about Plaintiffs operations by claiming that it is a criminal enterprise, that they only remit a small portion of the orders that they procure to publishers and that the Plaintiffs make misrepresentations, which they do not. It is Defendants, by these improper means, that created the environment which makes it virtually impossible for Plaintiffs to engage in their legitimate enterprise.

If Plaintiffs are unable to proceed with their claim, defendants will have been able to make false statements to an untold number of industry participants with the sole purpose of putting plaintiffs out of business. Defendant Wells admitted in the seminar which she conducted in New York in January 2015 that publishers were unable to successfully litigate against plaintiffs, and that she had to resort to the propaganda tactics of making false statements about plaintiffs business practices and directing scores of publishers and hundreds of consumers to file "complaints" to the Attorney Generals throughout the country and to plaintiffs banks. This conduct resulted in plaintiffs' banks terminating their relationship with plaintiffs repeatedly such that plaintiffs were unable to establish banking relationships with any bank such that they could not operate.

While Defendants claim in their declaration that they did not communicate with banks in Oregon, defendants certainly are responsible for directing other people to contact defendants' banks in Oregon, and elsewhere, for the sole improper purpose of putting defendants out of business.[9]

---

[9] This tactic was extraordinarily effective given the U.S. Department of Justice's "Operation Choke Point", which in essence directed the FDIC to direct banks to close accounts of purported "high risk" customers, such as tobacco sellers, firearm sales and, at issue in this case, magazine subscription sales. (*See* Lennon Decl., Ex. G.) Simply because the bank received complaints, banks would simply terminate accounts so as not to run afoul of the FDIC and the U.S. Justice Department.

**POINT IV**

**PLAINTIFFS HAVE STATED A CLAIM FOR
INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS**

A claim for intentional interference with business relations has six elements: (1) the existence of a professional or business relationship (which could include, e.g., a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages. *Allen v. Hall*, 328 Or. 276, 974 P.2d 199, 202 (1999).

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008).

Defendants assert that plaintiffs failed to state a claim not because the complaint was in any means deficient but because defendants made certain allegations "upon information and

belief" and that defendants believe they may be able to assert the affirmative defense of the statute of limitations.

The *Twombly* plausibility standard does not prevent a plaintiff from pleading facts alleged "upon information and belief" where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible. *Carolina Cas. Ins. Co. v. Team Equip., Inc.*, 741 F.3d. 1082 (9th Cir. 2014); *Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010).

The allegation in the complaint made upon information and belief are all allegations that are uniquely within the possession and knowledge of defendants and those persons that the defendants communicated. Plaintiffs were not directly privy to all of defendants' tortious statements and conduct. However, given defendants known statements about Plaintiffs, defendants' goal to put Plaintiffs out of business and the known effects on Plaintiffs, namely the termination of certain of Plaintiffs' vendors and banking relationships, the allegations upon information and belief are certainly proper inferences and beyond plausible.

The statute of limitations defense is also no defense since there is no issue that defendants engaged in tortious conduct as recently as January of this year during the seminar on how to put Plaintiffs out of business that defendants gave in New York.

Defendants also claim that the complaint is deficient for failure to plead fraud with specificity as required by Federal Rules of Civil Procedure 9(b), although defendants do not state what purported specificity is lacking. However, Rule 9(b) does not apply to this case because plaintiffs have not alleged a fraud claim. Rule 9(b) does not apply to this action for a claim for intentional interference with business relations. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097

(9th Cir., 2003), cited by defendants, is not an intentional interference with business relations case, and thus, has no applicability to this action.

If the court were to determine that certain of plaintiffs' allegations "sounded in fraud," plaintiffs have pled with the requisite specificity. (See e.g. Cmplt, ¶¶ 20 and 27.)

Defendants also contend that plaintiffs have a "pleading" issue based on the actions of third parties, including state attorney generals. Plaintiffs' claim against defendant is not based on the independent actions of the attorney generals and certain banks; plaintiffs' claim is based on the fact that certain attorney generals and banks took action against plaintiffs directly as a result of false information about plaintiffs' business practices provided by defendants to those attorney generals and banks.

The fact that plaintiffs ceased operations as a result of defendants' tortious actions does not relieve defendants of liability. Defendants are still corporations in existence that have their claims against defendants, and but for defendants' continuing tortious actions against defendants — we know as recently as January 2015 — defendants could enjoy the benefit of their business and prospective business relations. *McGanty v. Staudenraus*, 321 Or. 532, 535, 901 P.2d 841 (1995) (noting that tort protects prospective economic advantage in addition to existing contracts and business relationships); *Employers' Fire Ins. Co. v. Love It Ice Cream Co.*, 670 P.2d 160, 64 Or.App. 784 (Or. App., 1983).

In the event the court finds that plaintiffs did not properly state a claim, plaintiffs request leave to file an amended complaint. Rule 15(a) states that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). In interpreting Rule 15(a), the Supreme Court has held that:

> in the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant,

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

> repeated failure to cure deficiencies by amendments previously
> allowed, undue prejudice to the opposing party by virtue of
> allowance of the amendment, futility of amendment, etc. — the
> leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962).

## CONCLUSION

Based on all of the foregoing, it is respectfully requested that defendants' motion to

dismiss be denied in its entirety, and in the alternative, if the court grants defendants' motion to

dismiss in accordance with Federal Rule of Civil Procedure 12, that plaintiffs have leave to file

an amended complaint, and that Plaintiffs have such other, further and different relief as this

Court may deem just and proper.

DATED this 14th day of August, 2015.

LENNON & KLEIN, P.C.


By: _____*/s/ David P. Lennon*_____
David P. Lennon, OSB # 125575
david@lennon-klein.com
212-465-2020
Attorneys for Plaintiffs
Orbital Publishing Group, Inc.
and Liberty Publishers Service, Inc.